v. Donald J. Trump Good morning, Council. Mr. Binal, please proceed when you're ready. Good morning, and may it please the Court. Jesse Binal, on behalf of Donald J. Trump, I will endeavor to save two minutes for rebuttal. The District Court acknowledged that when President Trump made his address on the list on January 6, 2021, he was speaking on matters of public concern. It also held that speech is unquestionably a critical function of the presidency. It even found that a first-term president is, in a sense, always a candidate for office. Nevertheless, the District Court incorrectly held that the speech and other similar presidential communications were not protected by absolute immunity because the content of the speech had an electoral purpose rather than a governance purpose. This purpose-driven analysis that was favored by the District Court is effectively a rebranding of the motive-driven analysis that was considered and soundly rejected by the Supreme Court in Mason v. Fitzgerald. I'm not sure that's fair. The District Court just looked at the words on their face, looked at the speech, and said, is this political or is this governmental, without getting into what was in the president's mind. Why is that? It might be right or wrong. It just doesn't seem to me motive-based. Your Honor, the reason that it is is because when you look at purpose and when you look at motive, those are words that are used interchangeably in the Fitzgerald opinion, effectively interchangeably in the Fitzgerald opinion, and goes to what the intent of the president is for a particular communication. When you start to do that sort of functional surgery, when you get so far down in deciding, well, what really is it that the president is trying to do here? At that point, you start to blend the lines between what is something that is clearly within the realm of presidency under Article II and what is appropriate for Article III to look at. That's why the Supreme Court was so clear in the case of Mason v. Fitzgerald, that you have to have very bright lines because as soon as you start saying, well, the goal here really wasn't governance per se, but it was something that was political per se, it was to help him get re-election per se. Has the district court even acknowledged in this case with every first-term president being a candidate for re-election, it will become the exception that swallows the rule. I'm not sure line drawing cuts sidedly in favor of one side or the other. I think everybody has some line drawing issues here to some extent. Let me just explore that a little bit if I could. Suppose you have a circumstance in which a president has a private meeting with supporters and urges them, and this is in advance of an election, and urges them to go to the polls in unfavorable areas to intimidate voters and prevent them from exercising the franchise. And then there's a civil action that's filed by someone who's been intimidated voting under 1985, which I think encompasses this kind of effect. And the president asserts official immunity. And by far, that would be a horrible situation that we would hope would never happen. But in a case like that, and what the Fitzgerald court was very clear on, it's not that there's not a remedy. The question here is only on civil liability versus accountability. There still is the opportunity for accountability. So your answer is that in that situation, there'd be official immunity. There would be official immunity, but even if it's a private, it's a totally private conversation. And it's a private conversation between a president and supporters, and he urges them in private. What I'm worried about is winning re-election. All I care about is winning re-election. Doesn't have anything to do with any policy agenda. It just has to do with I want to be president. And I want you to help me make that happen by going to the polls in areas in which voters are likely to vote against me and prevent them from voting. A truly horrible situation if that were to happen. I want to make that clear. But in that case, the question is not necessarily whether it is political or electoral, but whether it is still something of public concern or as the Clinton court said, only a private concern. And in that case... Well, I think what the Nixon court said was it's within the outer parameter of official responsibility. And that's the language that we're all revolving our questions around. And so you think it's within official responsibility to urge supporters to prevent people from voting. I think that's a disgusting goal. But I think that's well within the realm of what the Fitzgerald dissenters used in their parade of horribles about how bad this could happen. What could happen if this goes wrong and what the Fitzgerald court said. We understand that sometimes, even in the most extremist circumstances, there are rights without remedies. And we do that with immunity every day. What is the official responsibility that's being uttered there? In this case? In the hypothetical. Oh, I'm sorry. In the hypothetical, it's, of course, in something as bad as that, you don't want to say that there was something clearly on point the president could point to. But the president taking actions regarding elections, and I don't think you want to filter down any more than that. Then you get into this type of judicial oversight of the executive that was not envisioned by the founders. So the executive being part of the elections of the bully pulpit of the presidency, even if it's something that's only privately said to the supporters to advance that. And I agree with that. But the only thing that's being advanced in that hypothetical is re-election. That's it. And what's the official responsibility? You cannot separate governance from election. If the president wants re-election, it's so that presidents can continue to govern. And so because of that, that's, I think, as far down as you can go to see that if this is within the realm of the presidency, as bad as that particular act might be. And I want to make it clear, that's something where you would have an extremely strong case for impeachment and house conviction. And then you have the impeachment and judgment clause. The beauty of this is that the founders gave us this system. They said that in certain circumstances, they know that something could go horribly wrong and that the president needs to be taken out of office. And if he is, at that point, he can be prosecuted for it. But that impeachment isn't always the answer, right? Because, I mean, even you acknowledge in your briefs that there are certain things that a president does while in office that wouldn't be subject to immunity. You had some, I think sexual assault was one of them that comes up. I think the Clinton case was clear on that. And so you could have an impeachment proceeding based on that if it's conduct while in office. And if impeachment, if conviction didn't happen after impeachment, you still allow for a civil action. In other words, it wouldn't matter that there's the impeachment remedy and it turns out that impeachment was unsuccessful. No, I would say it's more like concentric circles on something like that, where, of course, you can have an impeachment based on private conduct, not just official conduct. And you can certainly have a lawsuit based on, as the Clinton court said, purely personal conduct, where you have something that's sexual assault, something purely of a purient interest, especially, of course, with the Clinton case. It's also very clear that it happened before the presidency, not during the presidency. And I think it's particularly important. No, I was talking about hypothesizing one. I didn't understand your brief when you talked about sexual assault to be limiting it to sexual assault before the presidency. I assume you cover sexual assault, even if it's coterminous with the presidency. Yeah. It's something like that. It's purely of a purient interest. So the sexual assault, if it was, you know, someone, if it was a president talking to a stockbroker about his individual stocks, for instance, something that was only of his financial interest himself, not worried about the broader economy, but only the financial interest himself, that would be another example of something that is a Clinton court, but purely personal. And so if you have something that's purely personal, that's different. Even if it's a speech, so on the purely personal one that you just highlighted, which is personal financial interest, you could say, buy my family's product, buy my son's product instead of the competitor product, because the CEO of the competitor's company is a, name your immoral conduct that's going to dissuade somebody from purchasing it. And the only thing that's going on is personal financial interest. Even if it's in a speech, you'd think that would not be immune. That hypothetical is, I think, a much closer case because it could very well be that, you know, buy my product because the other side is bad, could very well be a public concern. But if it was buy my product because I want more money in my account, and it was really limited to that, if it was that narrow, then yeah. And how do you know that? So don't you have to mind motives to some extent, as you started out saying, to decide when the president says, buy my son's product. And I really want you to buy my product. And, you know, part of the reason you should buy my son's product is because the person who sells the other product is a philanderer. It doesn't have anything to do with... A much, much closer case in something like that. And, you know, the other person being that philanderer, I think probably takes it to the point where it could very well be something that the public concern, because it has to do with society's mores, rather than just private concern. But that is a much, much closer case. And it is clear that in order to decide if it's something purely personal, in the words of the Clinton Court, you have to look at the act to decide that. But what you can't do is dive so far down that you run directly about of what the Fitzgerald Court said. And it's, I think, noteworthy that in this case, the district court claims to be looking primarily at the Clinton case. But really, if you look at it, it's following, it's paralleling the objections of the dissenters in Fitzgerald. And so that really is the difference there, is are we taking and are we looking at a communication or a an objection about, well, this is really personal, it's not presidential. But once you do that, you start this Article III oversight of the executive that is directly opposite of what the Fitzgerald Court was looking at. When the president gets involved in electoral counting, what enumerated power of Article II is he acting on? Your Honor, while it's very possible that when the president is campaigning, he might be executing, or just focus on electoral counting. I'm sorry, on what? You know, the president has to take care of power, which encompasses all federal statutes. He is a lawmaker to the extent he can sign or veto bills. So if he's talking about things that could be the subject of a federal statute, but that's sort of easy to see. The electoral counting seems different because the Constitution and the statutes are very clear in excluding the president. So what power is he acting under? And the words here are important because the Fitzgerald Court doesn't use the word power or duty. It uses the word function. It uses the word function. So it's something that's directly in the statute or Constitution, but it does fall within the presidency. I mean, is that a vehicle for creating an unenumerated power in the president? No, it's not something that creates unenumerated powers. What it does do is... Then which power is he acting on? It's something that part of the historical aspect of the presidency that's been long recognized is the bully pulpit, is the president speaking on things that are not necessarily within his federal Constitution or Article II power. So for instance, it is very, very normal for presidents to comment on decisions of courts now. It has happened many times this year alone. It's very normal for a president to comment on any number of things that the president was specifically excluded from under the Constitution. A veto override, the president would still speak even though he has no part in a veto override. There's any number of things that is normal and customary for a president to speak about using the bully pulpit, using those matters of public concern. And in these times, it's especially important that we protect the ability of the president to act in the words of the Nixon court with the maximum ability to deal fearlessly and with the authority of his office. And so that goes just beyond... And the Fitzgerald Court talks about, you can't draw lines that are so fine that it ignores the history of the presidency and what the president does. So even if you haven't cited a Supreme Court decision that quite goes as far as your last proposition, you are asking this court to adopt that standard. In other words, you resist any effort to drill down in your words. Yet, what I hear you saying, I thought you were going to say, you're going to use the bully pulpit because that's just traditional, a part of a president's function, whether he is commenting on the actions of another branch or not, that the court has no role to play here. Your Honor, if it's something, I would say that if it is something on public concern, that's right. At that point, the remedy is different than a damages action on the civil side of the court. At that side, then we have to follow the other remedies that are available, something that the Fitzgerald Court was very, very clear about. In the Fitzgerald Court, I think it goes into some detail about the 75,000 other, at that time it's probably more now, 75,000 other people in the country that have protections of absolute immunity, and that doesn't mean that there aren't very worthy plaintiffs that are denied a remedy because of that. If you look at the remedy- That's really your point. Historically, separation of powers, the founders made certain choices, and to the extent those choices were, what I'll say, rational decisions based on their experience in dealing with the king, that there may be gaps in our system such that, for example, the president may have no role in ensuring the electoral integrity of the process for electing president, but nevertheless, that is within the outer limits. As I hear you, and I thought this was true in your brief, you really resisted any definition of limits. I know the Supreme Court has spoken in terms of, when you can't cite an enumerated power or authority, then you can, of course, rely on history, but the court there seems to be focusing on 200 years of precedence, for example, in subpoenas of presidents. I just wondered how you would have the court write the standard. Thank you, Judge Rogers. It is, of course, important to have standards like that. The standard that the court should adopt is very similar to what was already done with Fitzgerald, in that you're limited to only seeing whether something is either within a statutory framework for the presidency, a constitutional framework of the presidency, or a historical framework of the presidency. If it falls within that, that is the end of the inquiry for absolute immunity purposes, especially for the presidency, where it's perhaps the most important absolute immunity of numerous in our system because it's so inherent in the separation of powers. At that point, once you decide it's on issues of public concern, there's still an opportunity for accountability. It's just not accountability through a civil damages lawsuit. Suppose I agree with you on speech of matters of public concern, and I also agree with you that it is too fraught to, as a general matter, to try to distinguish political speech from official speech as to the president. What makes this a hard case for me, putting all of that aside, is the at least colorable case of incitement. And what is the functional justification or historical pedigree for extending an absolute immunity in the actual case or a hypothetical case to a president who just incites lawless action, riots in the streets, and so on? Judge Katz, that's exactly the issue that I think the Fitzgerald Court was dealing with when they look at the arguments about what is the point of allowing a president to do something that is directly unlawful in person. No, it's very different. Fitzgerald was about a clearly official act within the president's power that might or might not be unlawful depending on the president's motive. It's a retaliation case, and the court says that's just too intrusive to try to police that line. It seems to me different. Take the hypothetical case. The president gets out the microphone and says, this election was stolen. They are not going to do anything. You go burn Congress down. Hypothetical. Hypothetical, of course. Not the second speech, but hypothetical. In a case like that, extend immunity, absolute immunity for that only as in regards to civil liability. And let's look at something that's very, very horrible, and that is a prosecutor purposely taking and manufacturing evidence to put an innocent defendant behind bars, something that is absolutely horrible. And we still say you can't sue that prosecutor. It doesn't mean that prosecutor is free from accountability. It just means that we say that that defendant cannot, criminal defendant, cannot be a civil plaintiff against that prosecutor. So because we sort of expect that if we allow claims like that, they'll happen all the time. They might turn on motives. The burden on the system will be too great. So we just allow that wrong to go uncorrected through civil remedies. This just seems, I mean, how many cases will there be with a colorable claim of incitement against the you know, is this just above the Brandenburg line or just below the Brandenburg line? Seems like that is not going to hamstring the president in his day-to-day job. I believe it is going to hamstring the president in his day-to-day job. Here's why. Is because once you start to draw that line and you start a type of Brandenburg type First Analysis of incitement in the presidency, at that point, you now have judges that are acting on umpires on what crosses that line and what doesn't in such a way that presidents will have to worry about giving speeches and everything, giving impassioned speeches, because every president has. And highly controversial presidents, highly controversial speeches by presidents, which has happened before President Trump, has happened after President Trump, and have to worry about what judge is this going to land in front of, what court is this going to land in front of in such a way that I might have to go through the full aspects of litigation, which is exactly what immunity is supposed to protect against. And that line drawing here, if you do, runs directly about, frankly, what the fifth year of the court was concerned about, where they knew that things would happen that would be controversial, and they knew that the founders gave us an option for that. They knew that there was a way for dealing with that. It just wasn't through civil damages. We'll make sure I find the other line of questioning. Okay. Can I follow up a little bit on what I thought was the main argument you were putting forward in your briefs, which is about the bully pulpit and speechmaking. But what I hear from you this morning is not necessarily about the bully pulpit and speechmaking, because it seems like your argument applies to purely private interactions. And so I don't know what work the speechmaking is doing. It seems like the line you're drawing now is purely personal versus matter of public concern, regardless of whether it's in a speech or in private. And am I missing something? Because suppose you have the personal product, promoting a personal product. Even in a speech, your point is that if it's just for driving one's personal wealth, that's purely personal. And the fact that it's in the book, it's the bully pulpit. The president uses the bully pulpit to say, buy this client merchandise. It's going to be great for me and my family. But I'm sitting on the bully pulpit telling you this is the best stuff you've ever seen. But you think that because it's purely personal, the bully pulpit doesn't matter. It really, the dividing line is between purely personal and something that's beyond that, so as to bring it with beneficial responsibility. I think we come back to the lines finer than history would allow there, which I think is awesome, where the bully pulpit is incredibly important to this analysis. But the bully pulpit is something going all the way back, as far as what I've been able to look at and find, and I've looked at a great number of speeches at this point, is on these matters of public concern when you're speaking as the president. And that's the line that I think is particularly important to draw. I don't think the court, I think it is difficult on any speech president gives to decide that it's outside the bully pulpit of the presidency. And certainly the bully pulpit is within the outer parameters of the presidency. But I'm just mindful of- But not no matter what it's about, because you don't have a bully pulpit over all this rule, because even if it's a bully pulpit, if it's a bully pulpit about something that's personal, you think no immunity. I'd say a bully pulpit on things that are personal only is not historically as clearly, historically, as part of the presidency. I think that would be a very fact-intensive inquiry. I think that's very different in this case. But I think that is something that is a much closer call. But I would say that- But close enough, closer call, yes, but close enough that the and it's purely personal, however you define the category. So it's really, really personal, not just kind of personal. Again, I think I understand where you're going with this. But so long as it's really, really personal, even if it's the bully pulpit, no immunity. That's the way you look at it. Sure. And I think the word is used in Clinton are right, purely, purely personal. If something's purely personal, the Supreme Court in Clinton says that that's not due immunity. That's very different. If you have a presidential candidate who then says, an incumbent who's running for re-election, who says, I want to be re-elected. And the reason I want to be re-elected is because it's really good for me personally. It's going to, I mean, my products are going to go through the roof. If I get re-elected, that's what I'm worried about. Admittedly, a much different case and admittedly a much closer call. And private discussions are certainly a closer call, but private discussions are also just such an inherent part of the presidency. That's why we have executive privilege, of course, is because private communications are also a very important part of the presidency. And so the question then becomes, is this something that is within the outer perimeter and part of the outer perimeter is speaking on matters of public concern. So if it's something where it's close, it's even close, and this isn't close. This is speaking about, you know, this is a speech about an election that's clearly political concern. This is dead center. But in the exception... Go ahead. Finish your... Thank you. Thank you, Judge Rodgers. But the analysis that you have is admittedly closer because it appears to be, you know, purely personal at that point because it's only a pecuniary interest. And then so you look at something that is, by the words alone, only a pecuniary interest, just like in the Clinton case of purely a sexual interest, then that makes it that very, very close call. But that's not where we are here. So let me ask you to follow up on a couple of questions my colleague asked, namely, had the president said, as I think Judge Katsas had a hypothetical, the election was stolen and I want you, my supporters, to go to the Capitol and burn it down, or words to that effect, I want you to personally attack members of Congress. I want you to interrupt the proceedings. And what I'm trying to understand in your argument is where hypothetically the president is undermining by his words, the system that the founders established, and arguably crossing the line to not only, maybe not specifically articulating, burn the Capitol and attack members of Congress. Nevertheless, that was the reasonable import of his remarks as the district court found. And to the extent neither Nixon nor Clinton involved this type of situation where, to put it bluntly, even though the president may speak about destroying the constitutional system and doing so by crippling another branch of government, that's all within the outer limits of the bully pulpit, which at least heretofore I hadn't understood to stretch so far that it could be that type of remark. And Judge Roberts, the hypothetical you use, of course, is different from encouraging your supporters to peacefully and patriotically make their voices heard. But I understand your concern and your hypothetical. And what I would, again, point you to is the Fitzgerald opinion where they say that presidential matters will arouse, quote, arouse the most intense feeling. So this is not something that was unheard of to them. And in a hypothetical like you just gave, you're looking at a much, a very, very clear example when impeachment could be used, go burn down the Capitol. Impeachment could be used. Conviction could be used. And very possibly at that point, there could be, through the Impeachment Judgment Clause, further proceedings. I think you're trying to get to the part where you're seeking absolute unity despite the nature of the remarks. And that impeachment is the only remedy. Isn't that correct? It's correct that that's what the Fitzgerald court said that the remedy is. And so it's not what I think is appropriate or what's not. It's that this debate has already happened and it was decided by the Fitzgerald court. What I'm trying to get at is that we may not have 200 years precedent, all right, that the court looked at it then, for example. But there's always a first case. And certainly the district court and this court is not required to ignore the obvious unless there would be absolute immunity. And I think your argument is basically, it doesn't matter what the president says. He may arouse feelings. He arouses feelings even where he knows people have come armed with military weapons. And any candidate knows there are fringe people supporting them. They have to be careful. But nevertheless, the complaint cites a course of conduct by the president over a month. And is there no role at that point where, as the district court found, and these are not the district court's words, but the president is seeking to destroy our constitutional system. And in the facts of this case, the answer is there is not a place in civil litigation to review those acts of the president. And as any matter of how- That's the limit. That's my point under your argument. Even though you couch some of your answers as well, we don't need to drill down any further. As a practical matter, regardless of what the president says, you're saying he is entitled to absolute immunity and the only remedy under the constitution is impeachment. And I'm just trying to get you to deal with at least, I don't read the opinions of the Supreme Court to the point that although I understand the references to history, I understand the references to president. But there always has to be a first case. All right? And maybe it's not this case. And maybe it'll have to wait for the Supreme Court to identify that first case. But isn't that sort of the factual situation that's before this court? Your Honor, the issue with the first case is that it will almost certainly open the flood doors to the 20th case and the 50th case. And so that is why we have to be, that's why the Fitzgerald Court was so careful to close those doors on issues just like this. And what the court is wrestling here is certainly understandable. But it's the same exact thing that the Fitzgerald Court wrestled with four years ago when it made a decision on that. And if the argument is that the Fitzgerald Court was just wrong, then that's a question for the Supreme Court, not for this court. Because these are questions as clear as Your Honor has been on the difficulties of presidential actions that arouse those intense feelings. The Supreme Court has been very clear that that's not a position for courts, especially in civil litigation. I just asked, no, go ahead, please. You've said civil liability clearly off the table, impeachment clearly on the table. Do you have a position on criminal liability? That's a very different case, but I think that I don't have to necessarily have a position on that because the founders did. And I think other courts have spoken more at length about it. The attractiveness of absolute immunity in the civil context might depend on the number of other remedies failed. That's right, Your Honor. I would agree with that. And so what you have is, for instance, we've talked about impeachment a lot today, but the Fitzgerald Court talks about the other remedies. Is criminal a possibility? Criminal, if you look at other cases that are out there, theoretically could be, especially when you look at the impeachment judgment clause, where in the hypothetical that the court used earlier, there was something so extreme as instructing people to burn down the Capitol and something that is inflaming. We're looking at a very, very different case in Peacely and Patriotically Make Your Voice Heard, where at that point, the case for impeachment for removal is so strong that you have the impeachment judgment clause for just that reason, for the founders being very clear that after an impeachment, after a conviction, after a removal from office, that there can be criminal aspects. You then also look at some of the other cases that have been cited more recently. Of course, you have the United States v. Nixon, et cetera, et cetera, where there could also theoretically be the other remedies that are available. And the Fitzgerald Court was extremely clear that they were only talking about civil liability. While they didn't go into as much detail about criminal liability, and that's not why we're here today, the Fitzgerald Court was talking about civil liability. That's why we're here today. Just two more questions I know, and we'll give you some rebuttal time. What do I do with the following set of considerations? That for when a president is seeking re-election, there's a lot of things that a president might do to seek re-election that are nothing bound up in his official responsibilities as president, because the opponent might seek to do the very same thing. And the opponent, by definition, can't be the president. So, the opponent says, I want to do the following things to make sure that my side wins. And all they're trying to do is to get an office. The president's trying to do the exact same thing. Why isn't it the case that when you have actions that could equally be done for the exact same purpose, which is to gain office, that a non-president can do, it takes it outside the can of what's within the perimeter of the president's official responsibility, which is the word. Yes, go ahead. Jeff Shreen, Wasserman. And there are certain advantages, of course, that are built into our advantage so much as it's something that follows the office of the president. And so, for instance, an early candidate for president is not going to have secret service protection. But if a president is, a candidate for president is not necessarily going to have the amazing advantage of having Air Force One. A president is. And in this case, there are still very robust protections for all presidential candidates. The First Amendment dead center has to do with political speech and what a presidential candidate is going to say on the campaign. I guess it's not what I'm asking about. And I know I'm asking you very abstractly, so I can make it more concrete. But I'm not trying to say that there's a disequilibrium and that one side is advantaged for purposes of the election. I'm not worried about that. What I'm worried about is whether it actually falls within official presidential responsibility when what's going on is campaigning for office. Both sides are campaigning for office. Both sides do things that try to maximize the chances that they'll win. It just turns out that when the president does some things that maximize the chances that he'll win, it's immune when the other side does the exact same thing. The other side, to use the hypo I started out with, tries to get people to the polls who support them to prevent anybody from voting in districts that are going to be disadvantageous for them to have a high vote count. And all they're trying to do is get in office. It doesn't have anything, by definition, has nothing to do with official presidential responsibility because all they're trying to do is get in office. The exact same thing the president's trying to do. All he's trying to do is trying to get in office. Yet total immunity on one hand, you can have agreements with people to go to the polls to stop people from voting, and you can't be sued civilly. That's right, your honor. And I understand what the court is concerned about there, but what I would say is there may be a number of things that are within the functions of the presidency that are not unique to the presidency. So while it is unique to the presidency that he has, at least highly unusual to the presidency, probably unique of the bold pulpit of the presidency, it certainly is not a case that other people can't give impassioned speeches that get a wide audience and that you're going to have different legal protections. And it is still the case, for instance, that government employees that retaliate against other government employees are not going to have the same level of immunity. They'll have a different immunity. And there's certainly, of course, retribution and employment that happens all across the country today. There's no immunity at all. And of course, in courtrooms just like this one, certainly in this building, you have people that are operating where a prosecutor can do one thing and be immune from civil liability and a defense attorney can do almost the exact same thing and is very much subject to liability. So this is something that's inherent in our system that because it's so important to protect certain functions of certain offices, that it's going to be that disequilibrium at least to some extent. But last question for me for now. The insulation that immunity affords would apply even if the president who's a presidential candidate offers payment, right? So the way you're looking at it. So if the presidential candidate says, I'll pay you to go to the polls to prevent people from voting. I'm not talking about speech. I'm just saying that's an action that just says, it's just an action that says, I was intimidated from voting. I went to the polls to vote. I couldn't vote because this person came to me armed and said, you're not going to vote today. I went home. It turns out the president paid that person to make sure that I couldn't vote. Doesn't have anything to do with speech. It's just the conduct preventing me from voting and the conduct the president took. Your answer is still immunity. My answer is that immunity civilly, right? That is something that there should be very serious consequences for in the other aspects of accountability. But as far as civil immunity goes, even in a case where, you know, first amendment law would treat something as a verbal act rather than a speech. Yes, yes, yes. This is different than that. That's not this case. Why do you need to win that? I don't need to win that. I think that, of course, is a much, much closer case. Well, I'm going to admit it's like an extraordinary. That's an extraordinary. And I will say that that becomes something that certainly is very fact-dependent because it's not part of the bully pulpit of the presidency. It's something that matters. But we already got past the bully pulpit. I think earlier you realized we're past the bully pulpit because even private conversations are fine as long as they concern an election. And certainly, yeah, immunity is not limited to the bully pulpit. Absolutely. And so what I'm getting at there is that it is certainly much harder to tie the hypothetical that you just gave into a historical aspect of the presidency, such as the bully pulpit. It's a much, much closer case at that point. So, for instance. But still immunity under your view. I mean, your argument is that you have immunity because it has to do with an election. Well, it's a closer call. I still think immunity probably would apply in that situation. And one thing to look at is congressional immunity where you might have one member of the House of Congress beat another with a cane. Right? And that wasn't part of the speech and debate. Because it was beating with a cane, there was criminal liability on that. And there was no protection on the House floor when that happened with Preston Brooks beating Sondra and Alita for the Civil War. So something like that where we look at the other immunity for Article I, you can look at and see that there is a much closer. Right. And to be, to fall within immunity, which you said it does, that means that that conduct is within the outer perimeter of official responsibility. That's within official responsibility. I'm saying that it's, that because it's, let me watch that back. It's totally your answer. It is. It certainly is my answer that it is, but it becomes then the closer call that we talked about, not nearly as clear as we are here as to whether that's connected to something that's historically part of the presidency, unlike getting a presidential speech or communicating as president. Okay. One more question for me, which is about an argument. I don't think you may correct me if I'm wrong. The principle statute here applies generally to persons. And we in the Supreme Court have a line of cases, which say, you have a generally worded statute that covers persons or agencies, right? In the FOIA context, the APA context, we presume that those general words don't pick up the president. Did you make that argument? And if not, why not? I'm not sure that that's quite as with, let me say this. That is clearly something that the court should consider in a Nixon type analysis. And I think that the court certainly can make that a consideration in a Nixon versus Fitzgerald. Did you make the argument? I don't know if we made it in quite that way. I didn't see it in the district court opinion. I believe it was, it wasn't yet, you know, Judge Katz is trying to go back to the briefs. I don't want to make a representation that I'm- Fair enough. It wasn't before us. It just struck me that might be a little bit of a narrower and more textually based way of sort of operationalizing some of the themes you're articulating and getting into immunity, which has a little bit of a made up feel to me. That's right. And- Well, to be clear, as I understand the question, it doesn't have to do with Nixon versus Fitzgerald immunity. It's that textually- No, it's a textual- Whether that's open to us as an alternative. I'd say it certainly is open to the court to decide something on that limited ground. And I'd have to think about the avoidance and whatnot and whether that's the purpose of this stage. Immunity is a little bit open-ended. It might be common law-ish, but it might be article two-ish. So if we render an immunity holding, I suppose it depends on how we write it, but we could be saying something about the constitution, which statutory theory would not. That's right. And this gets into a little bit of a discussion in Fitzgerald, actually, between the majority and Chief Justice Berger talking about what Congress can specifically do regarding making it so a president is specifically subject to the suit. But I agree. That would be an avenue that the court could take to resolve this question. Well, not our court. That issue's not before our court. You're just saying a court- A court district. That could certainly be something that resolves it. But it's not part of the immunity question. It really is not part of the immunity question. It's something that I would say is separate. And so that's something that could be looked at. Make sure my colleagues don't have additional questions for you at this time. Thank you. We'll give you some rebuttal time. We're going to hear from Mr. Sellers now. Good morning. Please, the court, Joseph Sellers. I do want to address the immunity issue. Before I do, I want to answer a question Judge Katz has just asked, although I think the issue of, I think it's the clear statement rule, is not an issue here because the nature of the question presented. But I would just call to your attention the Franklin against Massachusetts Supreme Court decision at 505- That's the one I had in mind. Okay. Well, the key there, the language there expressly says that the president's coverage of the statute, which it's not named, should not be presumed where it might interfere with president's constitutional prerogatives. And I submit that here, the president has not been engaged in anything remotely like constitutional prerogatives. So while that statute might apply in other circumstances where the president is active and argued outside of the outer perimeter of the presidency, I don't think you can apply that rule here. And I think Franklin and courts interpreting it have so recognized. So let me turn to the question that we do have before us, which is the president Trump is not entitled to the immunity, which he seeks because his conduct interfered with the peaceful transfer of power, which is exclusively entrusted to Congress by the constitution in which the framers intentionally excluded the president from. And as a result, it's inconceivable that that kind of conduct, which infringed the prerogatives of another branch of government and be within the legitimate duties of the presidency, even the outer perimeter of those legitimate duties. It would be extraordinary. I'll come back to president Trump's proposed matters of public concern, although there may be less of that to discuss than before, but it's inconceivable that the president can avail himself of immunity, which derives directly from the same separation of powers underlying our government, that his conduct worked by blocking the discharge of duties solely entrusted to Congress and for which the incumbent president was intentionally excluded. He can't have it both ways. He can't avail himself of an immunity provided by the separation of powers and what by virtue of conduct it infringes on the separation of powers. And that is what he's done here. Let me just test that a little bit. So suppose the president exhorts people who he's speaking to, to go to Congress, to stop a vote on legislation that he opposes. That's interfering with Congress's conduct of a vote, but it's something the presidents often encourage people to let Congress know that they oppose legislation that they consider. I think the circumstances here are more extreme because this is a situation, there's no question that the boundaries between the branch of government are not always, they're not siloed. So there are occasions where one may be engaged with the other, but this is an area that's hermetically sealed from the presidency in which it's clear that not only was it exclusively entrusted to the president, but as opposed to maybe people appearing to lobby or express opinions on a piece of legislation. And very importantly is a federalist state for 68 states was intended to keep the president, incumbent president away from the very process he appeared with. So I don't think it's the same circumstance. I think this is a one that is not your run of the mill president's saying, you might go to Congress and tell people that you don't like this legislation, which is maybe even the province of the- What if the legislation is an amendment to the electoral calendar? I'm sorry, it's an amendment to the law that defines how Congress- I still don't think that it's, I mean, if it's enacted, it may be a different matter, but I think it's- No, but he opposes the legislation or supports it either way. Yeah, I don't think, I think we're talking about what's incorporated into the constitution and the electoral count act is an aid of enforcing the terms of the provisions of article two, but it's not something that is part and parcel of that. So I would not, I don't think we would think that is the same kind of violation of separation of powers. Do you think it is? It is not. It is not. So the president, that would be immune. That would be immune. Yes. There are lots of circumstances in which a president speaks on matters that aren't in any obvious way connected to his take care or bill signing or other enumerated powers. Your broadest theory would call all of that into question or would at least expose the president to civil suits. That seems troubling. Yeah. So let's just talk about a couple. The president is hermetically sealed away from deciding cases or controversies within the meaning of article three. There is hypothetically a leaked draft Supreme court opinion and the president issues, president issues, a public statement, strongly supporting or condemning the presumed decision in a pending case. Right. Again, I don't think it is. The bottom line is I think the president's entitled to immunity. He is entitled to immunity. On what theory? On the theory that. Just talking about the result in the case. Correct. And that's the reason I think he's entitled to immunity. The remarks, I think that President Trump's standard that he's proposing here, which focuses on the speech, although I will come to the district courts, I think well thought out characterization of the speeches is promoting his incumbency. But putting that to one side as a general matter, I think the remarks the president makes are generally immune from. Speech. It's speech. It's on a matter of public concern. And it's in an area where the president has no direct power. I think that what makes this particular situation an offense to separation of powers is that his remarks were part of a course of ongoing course of conduct, which led to the actual disruption of the performance. We'll we'll talk about that. And just to show a few cards, what makes this a hard case for me, I ask your opponent about this is the I'll just say arguable or colorable insight. But your broader theory about, you know, if the president is talking about a court issue or a state issue or cultural issue in the world. Oh, I think that's I'm sorry to interrupt you. I think those are ordinary functions of the presidency and would be well within the boundaries of the outer perimeter of the presidency. So the Supreme Court says that Congress lacks constitutional authority to and in fiery rhetoric urges the states to prohibit possession of guns within the school zone. That's fine. Again, I don't think it's an offense to the separation of powers. It is a form of which there's a lot of fiery rhetoric now these days in public discourse. So that alone, I think, is unusual. But I mean, I'm constructing the speech to it. But as I understand it, the key part of the hypothetical is that it directly urges the states to take action and that action, which and then it goes on to say, you better do this because these gun manufacturers have a lot on their hands and they don't care that school children are getting slaughtered. Right. Very fiery. Yes. And it's not just they should act. It's they should act because, you know, there's some bad person doing something. Again, I think there's there's immunity there. His action is his remarks are urging the states or anyone else to take certain action. But the key part is that the there was no interference there as there was here with the actions of a political branch of government. OK, so so hypothetical case, electoral counting. And the president. If the speech urges people to march and is crystal clear, he wants a nonviolent protest and he quotes Gandhi and Martin Luther King and asks the protesters to sit in front of sent the arrest. I don't think the the again, the focus from our perspective is on whether the consequence is the interference with, in this case, the electoral college count, ballot count. And if there's an interference with the core function of another branch of government, whether it is because they he's told them to act peacefully and they nonetheless interfere or he incites them to violence and they interfere. The key is that they interfered in as part of his direction in a in a core function of another branch of government, exclusively entrusted to their branch of government. And here, one that was the framers could have been clear that they wanted the president to stay out of the answer. Just to answer the hypo. I'm sorry if I didn't answer. There is immunity or there's not. There's crystal clear. He wants to speak a peaceful protest. There's immunity. At least if I understand correctly, there was no interference with the ultimate electoral college ballot in your hypothetical. Am I correct or am I misunderstanding? Well, I'll give you two. First one is no interference, crystal clear, no violence, peaceful protest. I don't think I think there's a view. OK, same hypo. Except just take this as a stipulation, unforeseeably to the president. Right. Some some bad apples in the group. Right. Don't follow his direction to peacefully protest and and break in. So so you raised the question, which I think is I'm sorry, I just need to answer your question is by saying that. I think under those circumstances to be direct, there's probably immunity, but I want to distinguish it from the circumstances here, if you'll permit me, because here there are, and I can review them from the record, events that occurred here that are not just that showed this was a continuous course of conduct by the president, which he is ultimately responsible as opposed to the totally unforeseen circumstances, which I understand. I agree with how you're thinking about the case, which is to say the pressure point is the arguable incitement. That's a bit different from the district court theory, which is trying to draw a line between speech, quote, official speech, quote, president and speech, quote, candidate. So let me let me turn to that, which I the district court, I think, offers another and in some ways narrower ground on which to affirm, but it is less susceptible to any clear. I actually think it's much broader. It's much broader, and we can put the line between candidate speech and presidential speech is going to. I'm sorry. I totally agree with you. When I said narrower, what I meant was on the well-plated allegations of the complaint here, I think the district court's ruling can be affirmed. What I think even the district court acknowledges is that, excuse me, it's very hard to draw some lines based on that that would guide future presidents, which is why I think we look to as the benchmark, the separation of powers is a much more durable and a bench of way of looking at this and one that the Supreme Court in the Nixon case and the Clinton case both examined. That's the narrow ground. When you say there's a narrow ground, that's the one. I'm sorry. What I mean by narrow is very precious and well-defined ground. But that is the one. I'm sorry. Which is what? I'm sorry. If it's if it's not, if it's not a case by case judgment of whether the challenge speech is official or electoral, what is it? It's instead that the general standard is whether it infringed, disrupted the separation of powers, infringes a legal branch of government in discharge of duties exclusively entrusted to it. And the point that characterizes it as narrow or broad is it offers, I think, a clearer guide to future presidents in courts and one that is infringed based on some of the jurisprudence admittedly delimited from the Nixon and the Clinton case. So if a president, if President Clinton, while the Supreme Court is considering Clinton versus Jones, exhorts people to go to the Supreme Court and let their voices be heard to urge the court to rule in his favor. To rule against, I'm sorry? To rule in his favor in Clinton versus Jones, which is on the day of argument. Yeah, no, no immunity. Because there's separation of powers, it's interfering with the conduct of another branch. If it is, if its effect is not just a purpose, if the effect is to, you know, if they disrupt the functioning of the Supreme Court, if they stop the deliberations, if they do something of that sort, I think there's no immunity. And that, and whether it has that consequence is based on the allegations in the complaint. So the complaint alleges that President Clinton urged everybody to go to the Supreme Court to protest loudly. That ended up causing the court to take a recess while in the middle of argument, and therefore, suppose that there's some injury that results from that, and civil liability, no immunity. I see my, I'm sorry, we might keep you longer. That's fine, I'm happy to do this. Yeah, please, no, thanks for noting it, yeah. So I think under the circumstances you presented, again, I want to focus on whether the entire course of conduct that started with President Clinton urging the crowd to go to the Supreme Court would have been that the interference with the functioning of the court would have been part of the, it's strictly bound up in his original direction or exhortation. So if he had said go to the court and, you know, stand outside and chant, we want a certain outcome, and that was it, and some group nonetheless went and invaded the court. I think it is a harder call to divest him of immunity because it is under those circumstances a part of the continuous course of conduct of which the endgame, the interference, was not part of it. I can give you some examples in the complaint here, or in the record here, which I think show why this particular situation is part of a continuous course of conduct which would, was. But I thought a lot of the allegations are to the effect that the President knew what was going to happen. He kind of catalyzed what was going to happen. He didn't actually say, I don't think there's an allegation in the complaint that says go do what ended up happening. So there's always going to be this question of predictable consequences or foreseeable consequences, even if the words themselves as alleged in the complaint don't call for those consequences. But the circumstances here, I can give you a few examples from the record that I think demonstrate that the President Trump here set this up with, in order to interfere with the electoral college ballot counting. So besides the fact that he called the assembled crowd and direct them to the Capitol, which by the way, it was a violation of the permit, which only allowed them to stay at the list. In dispatching the crowd to Congress, President Trump urged them to take back our country by demanding that Congress do the right thing and only count the electors who have been lawfully elected, sorry, lawfully slated. He began these before January 6th. Of course, he was repeatedly telling his followers about the election was stolen, stop the steal, it's fraudulent. So he set the stage on January 6th for a series of expectations about the legitimacy of the election. He then dispatched the crowd to go to Congress. And as we also, as alleged in the complaints, he chose the timing in such a way he could have waited until the electoral college balloting had concluded. But he chose to do this at a time when exhorting the crowd to stop. And I think those circumstances make this evident from the record without a need for discovery or anything like that. That was ultimately part of the overall course of action, which- But it seems like a lot of that goes to degrees of likelihood that the injury would come about. And there's various data points that you've put together, both here and in your complaint that say, should have known what was going to happen. And that's the same thing could be true when a president says, go to the Supreme Court. And on that hypothesis, that's the only question, which is at the outset, I think, in response to Judge Cassis, if there's a leak of an opinion, and the opinion hasn't been issued yet by definition, so we don't know yet what the outcome of the case is going to be. If a president then urges supporters to voice their opposition to what appears to be where the Supreme Court's what's the difference? And I think you said that would be immunity. What's the difference between that and telling them to go there on the day of argument? It's still that the decision hasn't been rendered yet. It's still urging people to go and affect what the result's going to be. And it's still urging them to go and affect the results of a proceeding that's pending in another branch of government. Right. And again, I think there's a difference in what I believe here was conveying the expectation that they would actually intrude on, stop the process for counting the electoral college ballots. If hypothetical, it had been, and go into the Supreme Court and stop them from deliberating or something, I think we'd have a different situation because under those circumstances, they would be directly disrupting the functioning of a standard. What's the standard you would say that we would write into an opinion that divides the kind of exhortation that infringes the separation of powers in the way that you think in situations that fall short because the outcome happens and it sets in motion a chain of events that results in the outcome. You still have immunity. I think based on the allegations of complaint that there was, that the president launched, took action that disrupted or blocked the performance of a function. I'm going to say blocked or disrupted because that term is critical to this as opposed to complaining or protesting or something, but actually disrupted the discharge of duties by a co-equal branch of government in the area that was exclusively trusted to that branch of government. But not that it had that result because that's going to be the allegation in any case in which that result ensues. So what's the standard that has to turn on what the president in fact said or did, right? Without regard to what he was talking about. Yes, but it's that there is, I think you have to evaluate it without having recognized what the result was, whether the president intended the results or not. But so the first point is, it didn't have the effect of disrupting the discharge of duties exclusively trusted by the branch of government. But in order to attribute that to the president, which was a vestment of immunity, you have to look at, I think, excuse me, the entire course of events leading up to it, including events with respect to, for instance, what happened before January 6th, and look to see whether the president could reasonably be credited with responsibility for that series of events all attributed to his remarks or his instigation. And admittedly, it's based on the allegations of what is, we know, although the immunity is denied, the president has an opportunity at the trial court with additional discovery to show that in fact, I didn't, that didn't happen the way that you've alleged and I'm. So I may be my own density. So forgive me, but it may be my own density. So forgive me, but the standard would be then predicated on, it has to be predicated not on the actual outcome on the effect. It has to be predicated, the standard by which we determine whether immunity exists has to be predicated on what the president said or did. And that standard, I heard blocker interference. So as the standard, the president asked for blocking or interferencing or interfering either overtly, explicitly or implicitly. That is, I think you, as you point out the president, and I think this one was in our, our locations are, was very artful in the way he did this, did not ever announce, go to Congress and stop this from happening. But why doesn't that apply to president, the president Clinton hypo? The same thing, you could just say, you stopped just short of it, knew what was going to happen. I'm just trying to get the exact words we could use. Yeah, I'm sorry. If you, if you can remind me of the particulars of your president, I know several. Right. So Clinton versus Jones is pending before the Supreme Court. The president says, I see, go to the Supreme Court, make sure a protest at the court. And I need to win this case. And doesn't say interfere, doesn't say stop the court from doing what it's doing. Could be seen as just go and peacefully protest, but also be seen as do something more. And that's the kind of ground that we have to be cognizant of if we were to fashion the standard along the lines of what you're saying. And I guess I'm not sure I'm going to be as much help with this as you would like me to be, because I think it turns on the contours of the allegations in the case. So I think your hypothetical, it's pretty thin compared to the circumstances we have here. And so I would say that instead of saying necessarily immune or as a whole, is it plausible to infer that the president was initiating actions, which were going to disrupt the performance of a block, the performance of a co-equal potential government's discharging of students. Possible to infer that the president was asking. I think that's all we can do on the, on the face of a complaint. And it wouldn't be plausible to infer that in the hypo in which the president says, go to the Supreme Court. I think it's, I think it would be a closer call. I think it would probably be so thin given the consequence, which is to, to waive immunity, that that would, might fall in favor of, of granting immunity. But it is, I do, I just think this has to be judged based on the allegations in the complaint and the sufficiency of them as to whether they show an intention to, or not an intention, but a precedent pursuing a course of conduct, which, which is directed at disrupting the performance of a co-equal potential government. What is the relationship between this standard you've articulated with blocking, I'll just call it the blocking standard, and the substantive First Amendment, Brandenburg standard? So it seemed to me very odd to say that the president would lose his immunity for this kind of inciting activity in circumstances where a private party would have a substantive defense under Brandenburg. Well, except that we hold presidents to a standard that they adhere to the constitution. And the private party has rights in some ways that the president doesn't have. So in your view, the president would, the president could be divested of immunity in circumstances where private party could not be held liable, consistent with the I think here we have a situation with that. Do you think the president on the merits has a First Amendment Brandenburg defense? I know the district court rejected it. Yeah. I think he has it. I don't think as a member of the government that I think he has a First Amendment even as an office holder speaking on matters of public concern. I again, don't think that the First Amendment. But I would add one thing in this setting, in this case, that if the Brandenburg standard were applied, I think he crossed it. So let's talk about that. That's to me, that's where the rubber meets the road here. Okay. And I know it's a tough case. If you look at, you just print out the speech, which I have done and read the words on the page, um, doesn't look like it would satisfy the stand, right? The worst parts of it are ambiguous terms, you know, fight like hell. And there are other parts of it that are explicitly say, don't be. Now, if you compare that to, um, we're going to break your damn necks, which is Clayburn hardware, or we're going to take to the effing streets, which is Tess. This looks less inciting. So, so first of all, I think this has the remarks on the lips on the six have to put in a broader context. This wasn't a speech that was delivered in a vacuum from blank slate. They had been building and building a series of view of expectations and skepticism and anger about the results of the election. And if you minimize the words on the page and maximize the context, I'll just call it, you know, the, the powder keg, just use that for shorthand, then it looks maybe dangerous. Well, and I, again, I would say that the fact that after rousing this group, which all responded to, uh, uh, an invitation to the president that was laden with, um, uh, expressions about the election was stolen and was fraudulent. And you have to make sure an illegitimate president isn't, isn't inaugurated and things of that sort. They come to the list. And as I think the term used a powder keg, he created a powder keg by virtue of the lead up to that. And then he ignited, um, uh, by, and yes, there may be no single set of words that the lips that are tantamount to the, uh, kind of examples that you have in the, uh, in the credit cases are taken as a whole. I think it's quite clear that the president, uh, was then igniting this situation. Um, and, um, uh, you know, talking about again, the Congress did the right thing. Only county electors have been lawfully slated and let's walk to the, I get it. Um, the sixth circuit has a couple of Brandenburg cases, including one involving a protester at a Trump rally, who was rubbed up, which seemed to stand for the proposition that if it's the words themselves are not very inciting and the primary danger comes from the powder keg, um, that's not enough to eliminate first amendment protection under Brandenburg. You have a view on that? I mean, I know you have a view on that, but how should we, I can't remember if these were in the briefs, but Bible believers and Wanguma. Yeah. I don't remember them being in the brief, but I can, I accept your summary of them. Um, so again, I want to back up for just a second and I realized this may be very important to you, but I don't think the Brandenburg standard governs here, but that said, if it weren't at play a role in this, um, I think it's in the sixth circuit concluded that, uh, the words are not enough, even if they're simply igniting a powder keg. Um, I'd have to see the circumstances in which they said that. I think we have a, an enormous powder keg here. I'm not sure you could say one that's the case for all purposes. And I have to look at the six decisions. One of them is, um, there's a Muslim festival and protesters go and right in the middle of it, very offensive things about Islam and provokes a violent response, but the things shouted are clearly protected. And the argument for, um, no first amendment protection is like, my God, this was a powder keg. Of course, this was going to happen. Any idiot would know that would be a violent response. And then, and then the second case is it's a, it's a Trump rally. There are protesters, the crowd's getting worked up and he says, get them out of here, but don't hurt them. So ambiguous words on the page, but the situation, right? So, uh, I'm not sure this is a perfect distinction, but one of the things I would say here is that the, uh, besides the powder keg situation, um, I think here, President Trump was launching a course of conduct, um, that was as opposed to perhaps calling some people by, uh, inflammatory names, for instance, or something of that sort. Um, and I think that the distinction is important because it makes, it puts the president in a position to be part of the action that followed rather than simply an instigator. Um, and, uh, not that I think he wasn't an instigator here, but I think that is a distinction. Okay. Uh, on, on Brandenburg is, is it the case? I don't have the answer to this. Do you get an immediate collateral order appeal in a Brandenburg situation normally? Not that I know of. So there's, you could do Brandenburg as, as overlapping with the presidential official immunity, but presidential official immunity also can be viewed as a distinct issue. Yeah. And I think that it's quite clear in this, the way the issue was presented by the appellant and with which we didn't disagree because the way it's framed is I think the only issue that is granted immediate appeal is the issue of immunity. Um, I submit that the Brandenburg issue is a separate important issue, but I don't think it fails. It could be formed because litigated below is a merits issue. I'm testing. If I, if I think it's a limiting principle, I'm happy to answer your questions. I just, yeah, I just was trying to understand the case. I don't think it is, uh, it is squarely before the court right now. It seems to me it's a novel issue because we don't have one way or another, a case on absolute immunity in a borderline or just more than borderline insight. Yeah. And so again, I, I, I agree. It's one that could inform the content of immunity. I don't think it could, but I just was making sure that I understood where we stood in the case. And it's one reason why we can, again, returning to the separation of powers because we think that's the benchmark with which to be doing this. And, uh, the nature of the remarks may be part of the course of action that is there, but it's not, we don't see the first amendment is interplaying with the, how the separation of powers allocates responsibilities between branches of government. So can I ask you one question that is in this general zone that's been giving me some pause, which is, does it matter if the statements that are at issue arise in response to a question from the press and a press conference, as opposed to a circumstance in which a president just chooses to make an affirmative statement or speech. And the reason I ask is you could obviously envision situations in which there's an elicitation of a response from a press question, or it seems eminently within the crosshairs of the president's official duties to have press conferences and respond. So he said the exact same thing, but it's in response to a direct question in a press. I think there is a difference. Uh, and the reason that it's somewhat responding to judge before is one where he has initiated this. Um, I think it shows a degree of his responsibility for the, uh, for the continuing course of conduct, even if in fact, in response to reporters question, he says, so somewhere you're going, I think is that then the exact, the literally the exact same words, I understand maybe apart from the lead in immunity in response to a press question no immunity when it's an affirmative speech. And I just want to make sure that that may be what you're saying, but I think what my, my intention was to say the response with the same content reporters question is immunity. So then, then in the affirmative statement situations, so put it in the land of non-immunity under your rubric, the president starts by saying, I know there's been a lot of questions out there about the following, you know, my state still no immunity there because it wasn't literally in response to a press question in the middle of a press conference, even though the Zeitgeist is right. I think, I think, uh, no, no, you didn't. Uh, I think the key question is whether you can infer from this, that there, the president was intending to launch or initiate a course of action beginning which you see starts with this statement, which you refer to. Um, and if that's the case, and there are in this case, other circumstances that are consistent with that, um, I think he's responsible. And I think he loses his immunity, but even though he may have said something very similar, identical in response to a press question, um, at least can he intend to launch that same in response to a press question? He could, if that's the way, if, if, if a reporter asks him, somebody says, I want to use this opportunity to, he doesn't say that, but he says the same thing. I mean, but the inference is kind of use that question as a vehicle. So, so again, you know, we are, these are going to be somewhat facts. I know this is not satisfying, but that's what we have to do. Fact driven kind of inquiries. And to come back to the point that the inquiry ought to be about whether the president, based on the well-pleaded allegations and complaint, it's evident that he was launching or directing a, uh, or himself, I mean, uh, a course of action, which is going to interfere with the, uh, political branch of government. And is it your view that then as a categorical matter in response, when it's in response to a press question, that's the end or more be satisfied. If it's, if it's in response to a press question, that alone insulates it from life. Is that what you're saying? Yeah, it does. Is that, is it categorical? No, I'm sorry if I wasn't clear. I mean, it ordinarily, I would think it would be immune, but I would say that it is functionally equivalent to what I just said, the president launched a course of conduct that I think he would have the same, same effect. He would lose his immunity. Correct. If it's a functional equivalence to, uh, to standing there and safety said in response to the reporter, thank you for asking that question. It gives me the opportunity to announce that I want the ground to go to Congress and do these other things. The fact that it responds to a press question, I don't think is right. I mean, I don't think it's ever going to be that stark, but it would be, you get the question and you say, in the course of giving the response, I understand. And I, again, I, it could be, it could be immune, could be not immune. I think it's, I think it depends on the circumstances. And I unfortunately think that that's up to the courts. So I understand the standard, uh, on summary judgment, but here, I just want to be clear. Um, you acknowledge, I think that the statement, the actual words used by the president are not what the crowd actually did. In other words, the president didn't say break in. It didn't say assault members of Congress assault, uh, Capitol police or anything like that. And what I'm concerned about is to what extent at this stage, we're in a position that a court is in a position to give the plaintiffs the benefit of all reasonable inferences. And as I understand your argument, because of the president being, um, the head of the executive branch, we expect certain types of conduct from him. And that conduct would not include denigrating the separation of had language in there that said, remember to be peaceful. Nevertheless, part of our political system, as you know, better than I is there are always, unfortunately going to be extremists on both sides who go too far. And the president says, I never told anybody to break in. I never told anybody to assault the Capitol police. I never told anybody, uh, to ramage through the Capitol building and, um, a more negative inference, I suppose arises because even as he was informed about the dangers that this crowd had placed members of Congress and had in fact disrupted the proceeding and that people were being seriously injured and there were direct threats toward the vice president. He did nothing to issue a calming statement and tell his followers, for example, go home, you know, stop this kind of lawful, uh, protests that's become all lawful with people being injured, et cetera. So by standing silent, even when he did not know arguably in advance that some of his followers would take his remarks to be asking them to do what they were doing. Nevertheless, given the words he used, he is entitled to immunity because commenting that he thought over a course of period, a course of time that the election was stolen from him can be viewed as a critique, a bullyful critique of the way the states were checking the votes that were cast and then certifying them to the Congress and sort of trying to put the most negative inference on what the president was saying. One of the areas I'm concerned about is we have a history in this country of protests where they may start out as peaceful protests, but they turn violent either because of opposing points of view or police actions, et cetera. So here we're talking about the president of the United States and he makes this statement after, as you say, a course of conduct. And then according to the complaint, even after he's told of the physical and human damage that has been done and is being done, he stands silent. So I guess my focus is that fact critical here, that that is an allegation in the complaint. Right. So Judge Rogers, let me try to respond to, you've raised a number of very important points. First of all, to the last point you made, the allegations are in the complaint that in the afternoon after the crowd began to break into the Capitol, the media was covering this. The allegation is that President Trump saw the reports of that and not only did he do anything to calm the crowd, he actually retweeted remarks that he issued at the Ellipse to support them. There's also, even before that, when at the very end of the remarks at the Ellipse, when President Trump called on the crowd to go to the Capitol, he started the allegations. This is a joint appendix, page 38. People were saying and shouting, storm the Capitol and take the Capitol right now. And the president did nothing to calm that or say, no, that's not what I meant. As to your point about there being buried within this lengthy set of remarks, a series of statements about go peacefully and patriotically, I think is one phrase that he used. Again, I want to make the point that this is part of a broader course of conduct and it has to be looked at that way, not parsed separately with particular senses, which I think would be a mistake in the world of courts and endless amounts of line drawing. Here, it was quite clear he had a choice that he could, if he really wanted to raise the concerns about what he viewed was a fraudulent election or election security or something of that sort, he could have done that without dispatching the crowd to the Capitol at exactly the point when they were engaged in counting the electoral college ballots. So this was sending a crowd to an area, as I said before, in which the constitution has hermetically sealed this from the president and entrusted only to the Congress. And it is, I think, in fair to refer from that, that his intentions were to have this crowd attempt to interfere with that. In fact, he said, you know, let's stop them from counting the electors and have only those who are lawfully slated. An area that, again, Alexander Hamilton was clear in Federalist Paper 68 was to be excluded from the incumbent president. So I submit that your points are well taken. I agree with them. There is a broader point here, which is about looking at this as a continuous course of conduct. One more question. I want to make sure that others got a response. One more question. You kind of framed this as two different ways to affirm in your mind. One is the blocking of the function of another branch, separation of powers rationale. And the other is seeking to vindicate a personal interest in obtaining office as opposed to falling within official responsibility. For your argument, we haven't talked much about that. And what's and they kind of merged to some extent, because one way to show that it's not part of the official responsibility of the president is if it's exclusively the responsibility of another branch. But and I don't want to have an entirely new argument on this, but I'm just what's your reaction to the proposition that attaining office is vindicating one's personal interest in a way that renders immunity principles inapplicable because it doesn't have to do with something that's within your official responsibility? Yes, that is clearly that's our position that seeking to perpetuate your incumbency or obtaining office, as you put it, is necessarily outside the scope of the official duties of the presidency, because the presidency has no view as to who holds the presidency. So it cannot be construed as any kind of exercise enumerate or otherwise of any duties entrusted by the constitution to the president. So it is a my only reason to focus on the separation of powers is because as I think the district court observed, it may be harder to provide some kind of admittedly not perfect, but set of benchmarks to give the courts to administer this using the separation of powers as the ground position, as opposed to the question that was presented here. But I thought the district court did an excellent job of reviewing all the allegations and assembling them and digesting them and concluding that ultimately the president was engaged in efforts to campaign to perpetuate his incumbency on these factual allegations. Make sure my colleagues don't have additional questions for you. Thank you, Mr. Sellers. Mr. Banal will give you three minutes for a rebuttal. We'll see where that goes. Thank you. As we started the argument today, one thing that the court brought up, and I understand the court's concern here, is that you said that there was line drawing issues on both sides. And I think we've seen that through the questioning today. One thing that I'd like to point out is that when there are these issues about line drawing, and you look at the stark separation of powers concerns, the tie has to go to the runner. You need to, and the Fitzgerald court makes... I assume you think the runner is the president. The runner is the president. And that much and more. The Fitzgerald court made so clear that even if it's close, that has to go to the president to protect that separation of powers interest. And the argument that my friend focused on about the alleged offensive separation of powers, what that framework essentially looks at is that by saying that there's an offensive separation of powers that opens the floodgates, you don't necessarily have to worry about standing. You then can say immunity no longer applies. That's a particularly problematic analysis, especially since for separation of powers concerns, there is impeachment. A dispute between article one and article two is specifically provided for in the constitution. Judge Katz says, and one thing that I think important to look at regarding the court's Brandenburg thoughts is, well, it's certainly not the case that Brandenburg would comprise the outer perimeter of the full outer perimeter. It is important to see that speech by a president that is clearly within Brandenburg. As this speech was, as the court pointed out, you have to look at the words themselves, not the powder keg. And that's my instinct, but give me your best shot on why at least at a motion to dismiss stage on these facts, we shouldn't say that there's at least a litigable issue. Because of the fact that immunity is meant to protect from litigation, not just from liability, but that is as the, as the Fitzgerald court points out by clearly other courts. This question is on the assumption that Brandenburg were not matters. And I understand your broader position is it doesn't matter. Just assume it does. You only need the protections of the first amendment when there is that powder keg and a lot of times for insight. So the powder keg is always there. It's certainly in there and the Clyburn case, it's certainly in there in Brandenburg and certainly in the progeny. And so that's why it is so extremely important at that point that we then look at the words themselves. And at this point, because those words clearly fall within that, it must be that within the utter fringes of the presidency, just as a matter of law, without needing further factual analysis, because for having to go through and do a further factual analysis at that point would eviscerate the entire purpose of immunity. I see my time has expired. I have one question. Sorry to belabor this, but there's allegations in the complaint that are and some of them don't naturally raise matter of questions or other kinds of questions. Some of them can be viewed as more private in nature outside the canon of what we've been talking about. So even if one thought that the January 6th speech is something that implicates presidential immunity, what about the fact that there's still other things in the complaint, like filing lawsuits in the personal capacity, like having private conversations with election officials in various states, like planning the rally? Things of that nature that don't really squarely implicate a lot of the things we're talking about here, but that are in the case. I think there's a reason why the district court effectively looked at this analysis as the communications, because those communications are the only thing that could survive the other aspects of the case. So for instance, the district court, when they talked about the First Amendment analysis, acknowledged that the First Amendment would prohibit those other aspects of it. So that's why I think it's appropriate when we look at immunity here. Primarily we look at the speech issues, but when you look at things like election lawsuits and other activities of the president, that still is within the outer perimeter. Regardless, it's, I think, still very clearly a part of the outer perimeter test. And then you also come to the very particular problem if you want to, as the complaint suggests, go towards some sort of negative responsibility of the president. So for instance, the suggestion in the complaint that the president had a duty to talk. Right, and that's not before us, because that, I don't think that the plaintiff's lost on that appeal on the 1986 part. At least it's not part of the collateral. I agree. We're talking about the other things as part of the complaint. I would say that when you look at all that together, is this still something that the president is doing on matters of public concern? Is it still, you know, beyond just the bully fault, that the president doing as president, and he is, and anything else the district court properly recognized would be prohibited by the First Amendment. Okay, thank you, counsel. Thank you to both counsel. We'll take this case under submission.
judges: Srinivasan, Katsas, Rogers